**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CYNTHIA B.,[1] | : | Case No. 3:20-cv-00336 |
| Plaintiff, | : | Magistrate Judge Caroline H. Gentry |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

**DECISION AND ORDER**

---

## I. INTRODUCTION

Plaintiff filed an application for Disability Insurance Benefits in February 2011.

Plaintiff's claim was denied initially and upon reconsideration. After a hearing at

Plaintiff's request, an Administrative Law Judge (ALJ) concluded that Plaintiff was not

eligible for benefits because she was not under a "disability" as defined in the Social

Security Act. After the Appeals Council denied Plaintiff's request for review, Plaintiff

filed an action with this Court.[2] The Court remanded the case to the Commissioner under

Sentence Four of 42 U.S.C. § 405(g). The Appeals Council remanded the case pursuant

to the District Court's order. Another ALJ held a hearing pursuant to the remand order

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] Assigned to District Judge Thomas M. Rose, Case Number 3:14-cv-00237.

and again concluded that Plaintiff was not under a "disability" as defined in the Social

Security Act. The Appeals Council denied Plaintiff's request for review of that decision,

and Plaintiff filed another action with this Court.[3] The Court remanded the case to the

Commissioner under Sentence Four of 42 U.S.C. § 405(g), and the Appeals Council

remanded pursuant to the District Court's order. Another ALJ held a hearing and, for a

third time, concluded that Plaintiff was not under a "disability" as defined in the Social

Security Act. After the Appeals Council denied Plaintiff's request for review of that

decision, Plaintiff filed what is now her third action with this Court.

Plaintiff seeks an order remanding this matter to the Commissioner for the award

of benefits or, in the alternative, for further proceedings. The Commissioner asks the

Court to affirm the non-disability decision. This matter is before the Court on Plaintiff's

Statement of Errors (Doc. 11), the Commissioner's Memorandum in Opposition (Doc.

14), Plaintiff's Reply (Doc. 15), and the administrative record (Doc. 10).

## II.    BACKGROUND

Plaintiff asserts that she was under a disability from August 14, 2009, to

November 18, 2015.[4] She was considered a "younger person" under Social Security

Regulations during the requested closed period of disability. *See* 20 C.F.R. § 404.1563(c).

Plaintiff has a "high school education and above." *See* 20 C.F.R. § 404.1564(b)(4).

---

[3] Assigned to District Judge Walter H. Rice, Case Number 3:18-cv-00104.

[4] Plaintiff initially alleged disability beginning June 1, 2003. (Doc. 10-6, PageID 219.) She subsequently amended the alleged disability onset date and requested a closed period of disability beginning August 14, 2009, and ending November 18, 2015. (Doc. 10-5, PageID 215; Doc. 10-14, PageID 1058; Doc. 10-18, PageID 1534.)

2

The evidence in the administrative record is summarized in the ALJ's decision (Doc. 10-18, PageID 1505-21), Plaintiff's Statement of Errors (Doc. 11), the Commissioner's Memorandum in Opposition (Doc. 14), and Plaintiff's Reply (Doc. 15). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## III.    STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may

3

not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even

4

if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## IV.   FACTS

### A.      The ALJ's Findings of Fact

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the regulations. *See* 20 C.F.R. § 404.1520.  The ALJ made the following findings of fact:

Step 1:       Plaintiff engaged in substantial gainful activity "during a portion of" the requested closed period from August 14, 2009, to November 18, 2015. However, there was a continuous 12-month period(s) during which Plaintiff did not engage in substantial gainful activity, and so the remaining findings address those period(s).

Step 2:       During the requested closed period, she had the severe impairments of "a history of migraine headaches, mild lumbar degenerative disc disease, obesity, depression, anxiety disorder, and posttraumatic stress disorder (PTSD)."

Step 3:       She did not have an impairment or combination of impairments that met or equaled the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:       Her residual functional capacity (RFC), or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of light work as defined in 20 CFR § 404.1567(b) work subject to the following limitations: "(1) occasionally crouching, crawling, kneeling, stooping, balancing, and climbing ramps and stairs; (2) never climbing ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no driving automotive equipment; (5) no concentrated exposure to loud noise; (6) limited to performing indoor work; (6) limited to performing simple, repetitive tasks with an SVP 1 or 2; (7) occasional contact with coworkers, supervisors, and members of the public; (8) no fast-paced work or strict quotas; and (9) limited to performing jobs which involve very

5

little, if any, change in the job duties or the work routine from one day to the next."

During the requested closed period, she was unable to perform any of her past relevant work.

Step 5:     Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform during the requested closed period of disability.

(Doc. 10-18, PageID 1508-1520.) These findings led the ALJ to conclude that Plaintiff did not meet the definition of disability and so was not entitled to benefits. (*Id.* at PageID 1520-21.)

### A.     Plaintiff's Migraine Headaches

#### 1.     *Subjective complaints*

Plaintiff alleged disability in part due to migraine headaches. (*See, for example,* Doc. 10-6, PageID 225.)  At the January 2013 hearing, Plaintiff testified that her headaches improved after starting Topamax, but said she experienced two migraines—which required her to lie down for an hour or more—approximately two days per week. (Doc. 10-11, PageID 857-58.) She said that during a migraine, she had to lie down with a cold rag on her head and the lights off. (*Id.* at PageID 859.) Plaintiff testified in October 2016 that she was currently experiencing three to four migraine headaches per week. (*Id.* at PageID 781.) She again said that she tried to alleviate her symptoms by lying down in bed in the dark; she also said loud noises would bother her. (*Id.* at PageID 784.) Plaintiff also testified that this level and frequency of headaches caused difficulty with her current job and that she sometimes needed to call off work due to the migraines. (*Id.* at PageID

6

783.) At the most recent hearing in March 2020, Plaintiff testified that she experienced "more severe" headaches two to three times per week during the requested closed period. (Doc. 10-18, PageID 1549.) Plaintiff said that even regular or "standard office lighting" and regular noises (like conversations) would adversely affect her during these "more severe" headaches. (*Id.* at PageID 1548-49.)

### 2. *Medical Records*

Plaintiff's earliest headache complaints are documented in May 2011, when she sought emergency room treatment for multiple complaints including headaches. (Doc. 10-7, PageID 423-29.) Plaintiff followed up with primary care provider LaDonna Barnes Lark, M.D. the next day; she reported headaches that occurred once per week and migraines that occurred once every two to three weeks. (Doc. 10-7, PageID 443.) A few weeks later in June 2011, Plaintiff presented to neurologist Sophia Cheng, M.D. upon referral from Dr. Barnes Lark. (Doc. 10-7, PageID 466.) Plaintiff said that her migraines started in 2003 but had gradually increased in the past two years; she said she currently experienced three to four headaches per week. (*Id.*) Dr. Cheng prescribed Topamax and referred Plaintiff for additional imaging and testing. (*Id.* at PageID 467.)

No further headache complaints or treatment for headaches were documented until almost two years later. An April 2013 primary care progress note indicated that Plaintiff presented with headache complaints, among other issues. (Doc. 10-16, PageID 1103.) But no details about frequency, severity, or medication efficacy were documented. (*Id.* at PageID 1103-07.) Additionally, although Plaintiff's medication list showed several pain medications, Topamax was not listed. (*Id.* at PageID 1106.) Progress notes from

7

Plaintiff's next primary care visit in May 2013 made no mention of headaches, although headaches were included in the list of Plaintiff's historical diagnoses. (Doc. 10-16, PageID 1099-1102.)

Plaintiff sought emergency room treatment for headaches a few months later in October 2013, but reported only a three-day history of headache—she said she otherwise experienced migraines "in the past." (Doc. 10-16, PageID 1131.) Plaintiff followed up with her primary care provider a few weeks later, in November 2013. (Doc. 10-16, PageID 1095.) Plaintiff said that she was no longer taking Topamax, and Dr. Barnes Lark referred her to a neurologist. (*Id.* at PageID 1097.)

Plaintiff apparently did not follow up with a neurologist at that time. No additional headache complaints were documented until March 2015, more than a year after the November 2013 primary care visit. (Doc. 10-16, PageID 1082.) At that visit, Plaintiff complained to Dr. Barnes Lark of severe migraines that occurred either once a month or every few months. (*Id.*) Plaintiff said she had not seen a neurologist since 2011, and Dr. Barnes Lark provided another neurology referral. (*Id.* at PageID 1082, 1084.)

Plaintiff subsequently presented to neurologist Shumel Man, M.D. in May 2015. (Doc. 10-17, PageID 1372-1377.) However, Plaintiff primarily complained of left-sided body pain and said she "rarely" had a headache. (*Id.* at PageID 1372.) Plaintiff explained that she used to experience "mild bifrontal tension like headaches" once per month and that these were "not an issue for her" anymore. (*Id.*) When Plaintiff visited Dr. Man in June 2015, she complained of a "bitemporal pounding headache" that had "lately" been occurring approximately once per week. (*Id.* at PageID 1386.) Dr. Man increased her

8

Neurontin dosage. (*Id.* at PageID 1415.) Dr. Man's treatment note from a November

2015 visit contained identical statements and findings. (*Compare* Doc. 10-17, PageID

1384-90, *with* Doc. 10-17, PageID 1390-95.) As indicated above, Plaintiff requested a

closed period of disability only through November 18, 2015.

### 3. The ALJ's discussion of migraine headaches

The ALJ addressed Plaintiff's headaches at Step Two and in the RFC analysis. At

Step Two, the ALJ summarized Plaintiff's treatment history for headaches:

> The main issue presented on remand is the effect of [Plaintiff's] headache
> episodes. She had several emergency room visits during the closed period
> for headache pain and unexplained left-sided paralysis (Exhibits B9F/B12F/
> B39F). On continued complaints of headaches and numbness (Exhibits
> B15F/B37F at 1, 14), [Plaintiff] was referred for neurological evaluation in
> May 2011 (Exhibits B13F / B16F). An MRI scan of her head taken in July
> 2011 did show some evidence of migraine activity (Exhibit 18F at 3) while
> an EMG of the left upper and lower extremity showed just mild carpal
> tunnel and chronic left lumbar radiculopathy at L5 (Exhibit B18F at 1).
> After that time, [Plaintiff] failed to follow-up so was again referred to
> neurology in March 2015 (Exhibit B37F at 3) when she reported that
> headaches, triggered by stress and lack of sleep, occurred only every few
> months. Rest and medication (Naproxen) helped, and she was still able to
> perform daily and self-help activities without problems (Exhibit B37F at 1).
>
>
> At her second neurological evaluation in May 2015 [Plaintiff] reiterated
> that she "rarely" had headaches. Body pain and weakness were her main
> issues and, at times, caused concentration difficulty and feelings of
> confusion (Exhibit B44F at 1). Another MRI of [Plaintiff's] head was taken
> that month and showed a Chiari I malformation (Exhibit 39F at 1).
> However, no basis was found to link [Plaintiff's] Chiari malformation to
> her headache pain (Exhibit B44F at 18) and, in fact, she has had the
> congenital condition since childhood (Exhibit B44F at 15). She complained
> of an onset of bitemporal headaches once a week with nausea and
> photophobia (Exhibit B44F at 15) though an intracranial MRA was normal
> (Exhibit B44F at 24). Medication "greatly" improved left arm pain (Exhibit
> B44F at 15).

(Doc. 10-18, PageID 1508-09.)

In the RFC analysis, the ALJ first explained which RFC limitations accounted for

Plaintiff's headaches:

> The fact that [Plaintiff] had headaches during this time is really not in dispute, particularly given an MRI scan showed some evidence of possible migraine activity. Consequently, customary safety precautions also have been imposed: [Plaintiff] should not have been expected to perform work unprotected heights or dangerous machinery, and should not have driven automotive equipment. [Plaintiff] indicated that she did have some sensitivity to bright light and noise during her headache episodes and, as such, she has been limited to indoor work where she would not have been exposed to bright sunlight and to jobs which would have involved concentrated exposure to loud noise.

(Doc. 10-18, PageID 1516.)

The ALJ subsequently discussed Plaintiff's headache complaints when concluding

that Plaintiff's alleged symptoms were "largely unsubstantiated by convincing objective

medical evidence or clinical findings":

> Medication was prescribed for [Plaintiff's] headache complaints during the alleged closed period and was effective in keeping [Plaintiff's] headache pain under reasonable control (Exhibits B37F at 1 / B44F at 1). Taken as a whole, [Plaintiff's] treatment records do not demonstrate that [Plaintiff's] headaches occurred with such frequency or severity that she could not have maintained a dependable work schedule.

(Doc. 10-18, PageID 1518.)

### B.    Consultative Examiner Giovanni Bonds, Ph.D.

Giovanni Bonds, Ph.D. performed a consultative psychological evaluation for

disability purposes in May 2011. (Doc. 10-7, PageID 446-53.) Plaintiff complained of

recurring depression, anxiety, panic attacks, migraine headaches, and numbness in her

arms and hands. (*Id.* at PageID 446.) She said that the migraines and panic attacks

10

occurred with stress and caused her to leave work. (*Id.*) Plaintiff reported "problems" with her last job as a licensed practical nurse at a nursing home; specifically, she reported absenteeism and needing to leave work early due to her conditions, but no disciplinary actions had been taken against her. (*Id.* at PageID 448.) She also reported that the job involved "long hours and having to take care of too many patients." (*Id.*) Plaintiff reported current depression because "her husband abandoned her when she became ill." (*Id.* at PageID 449) She also reported mood swings, feelings of hopelessness and sadness, and a prior suicide attempt, but no current suicidal thoughts. (*Id.*)

On mental status examination, Plaintiff presented as clean and neatly dressed. (*Id.* at PageID 449.) She was pleasant, cooperative, and understanding of the purpose of the evaluation. (*Id.* at PageID 449, 451) Her speech was clear and 100% understandable. (*Id.* at PageID 449.) Her thought processes were logical, coherent, and goal-directed. (*Id.*) Dr. Bonds reported that Plaintiff's mood "seemed" depressed but that her affect was broad and appropriate to thought content. (*Id.*) Plaintiff stated that she was "very nervous and anxious" but Dr. Bonds observed no overt signs of anxiety. (*Id.*) Dr. Bonds also found no evidence of thought content abnormalities. (*Id.*) According to Dr. Bonds, Plaintiff's general cognitive abilities "seem[ed] to be in at least the average range," and Plaintiff exhibited "satisfactory" attention and concentration during the evaluation. (*Id.* at PageID 450-51.) Dr. Bonds diagnosed a major depressive disorder, severe and with psychotic features. (*Id.* at PageID 451).

When asked to describe Plaintiff's abilities and limitations in four major areas of work-related mental functioning, Dr. Bonds primarily recited Plaintiff's subjective

11

complaints and described her performance during the evaluation. (Doc. 10-7, PageID 452-53.) For example, when asked about the area of understanding, remembering, and carrying out instructions, Dr. Bonds reported:

> [Plaintiff's] cognitive abilities seem to be in the average range. She is able to understand and follow directions. She read and completed the history form without assistance and seems to be able to read and follow written directions. She did not report having problems with understanding and following directions on her job.

(*Id.* at PageID 452.) With regard to her ability to respond appropriately to supervision and coworkers in a work setting, Dr. Bonds explained: "[Plaintiff] was pleasant and cooperative during this evaluation. She did not report having problems getting along with others on her job." (*Id.*)

With regard to the other two areas of mental functioning, Dr. Bonds cited Plaintiff's complaints about the stress of her prior job as a licensed practical nurse. (*Id.* at PageID 452-53.) For example, in the area of maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks, Dr. Bonds stated: "[Plaintiff] displayed adequate attention and concentration. She completed the evaluation and did not take excessive breaks. She did report that on her job [s]he easily becomes stress [sic] and overwhelmed and she will have to leave the job early when this happens." (*Id.* at PageID 452.) In the area of responding appropriately to pressures in a work setting, Dr. Bonds reported: "[Plaintiff] stated she has had problems coping with the stress of her job as a [licensed practical nurse]. Work pressures increase her symptoms of anxiety causing panic attacks and increased depressed moods. In response to the stress she often has to leave work early or she misses work." (*Id.* at PageID 452-53.) Dr. Bonds opined

12

that Plaintiff "may perform best in a low stress job where there are fewer demands." (*Id.* at PageID 453.)

> In weighing Dr. Bonds' opinion, the ALJ determined:
>
> [S]ufficient limitations on workplace stress have been included in the mental residual functional capacity assessment discussed herein. [Plaintiff's] propensity to walk off jobs seems fully within her control and not the result of uncontrolled anxiety or depressive symptoms further evidenced by [Plaintiff's] report that she "felt better when active and working" and was "doing well" when she had a job (Exhibit B45F at 19). Thus, Dr. Bonds' assessment is afforded only partially [sic] weight.

(Doc. 10-18, PageID 1511.)

## V.   LAW AND ANALYSIS

Plaintiff asserts that the ALJ erred in his analysis of Plaintiff's migraine headaches and his weighing of Dr. Bonds' opinions. (Doc. 11, PageID 1816.) Plaintiff argues that the ALJ improperly acted as his own medical expert when he evaluated Plaintiff's headaches. (*Id.* at PageID 1818.) Plaintiff also asserts that the ALJ's decision "is not supported by substantial evidence and [Defendant's] position is not substantially justified." (Doc. 11, PageID 1816.)

For the most part, these arguments are not well-taken. The ALJ did not improperly act as a medical expert but instead properly reviewed the medical evidence—including the evidence related to Plaintiff's headaches—to determine whether Plaintiff is disabled, which is an issue reserved to the Commissioner. In addition, although the ALJ partially erred in his evaluation of Dr. Bonds' opinion, the error is harmless. Therefore, the ALJ's decision must be affirmed.

### A.     Migraine Headaches

#### 1.     *Residual functional capacity (RFC)*

A claimant's residual functional capacity (RFC) is the most that she can do in a

work setting despite physical and mental limitations caused by her "impairment(s), and

any related symptoms, such as pain." 20 C.F.R. § 404.1545(a)(1). The ALJ is charged

with the final responsibility for assessing a claimant's RFC and must base it on all

relevant evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1). Relevant

evidence includes "information about the individual's symptoms and any 'medical source

statements'—i.e., opinions about what the individual can still do despite his or her

impairment(s)—submitted by an individual's treating source or other acceptable medical

sources." SSR 96-8p, 1996 WL 374184, *2 (July 2, 1996). "If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain why the

opinion was not adopted." *Id*. at *7.

#### 2.     *Evaluation of symptom severity*

When a claimant alleges symptoms of disabling severity, the Social Security

Administration uses a two-step process for evaluating an individual's symptoms. SSR 16-

3p, 2017 WL 5180304, *3 (revised and republished Oct. 25, 2017).

First, the ALJ must "determine whether the individual has a medically

determinable impairment that could reasonably be expected to produce the individual's

alleged symptoms." SSR 16-3p at *3. The ALJ must make this determination based upon

objective medical evidence in the form of medical signs or laboratory findings. *Id*.

Medical signs are "anatomical, physiological, or psychological abnormalities established

14

by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms." *Id*. The ALJ will not, however, consider whether the objective medical evidence supports the alleged severity of the individual's symptoms. *Id*.

Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms … and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." SSR 16-3p at *9. The Social Security Administration "recognize[s] that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence." *Id*. The ALJ must therefore examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*.

When evaluating the intensity, persistence and limiting effects of the claimant's alleged symptoms, the ALJ must consider the following factors:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p at *7-8; *cf.* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ need only discuss those factors that are pertinent based upon the evidence in the record. *Id*. The ALJ's discussion of the applicable factors "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10.

The ALJ must determine whether an individual's symptoms and accompanying limitations are consistent with the evidence in the record. SSR 16-3p at *8. For example, the ALJ will consider an individual's statements, keeping in mind that those statements may be inconsistent because "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time." *Id.* at *8-9.

Social Security Ruling (SSR) 19-4p provides additional guidance for the ALJ's consideration of headache disorders in the Sequential Evaluation. [5] SSR 19-4p, 2019 WL 4169635 (August 26, 2019). Significantly, SSR 19-4p directs the ALJ how to consider headaches when assessing the RFC:

We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. The RFC is the most a

---

[5] Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

person can do despite his or her limitation(s). We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

*Id.* at *7-8.

### 2.  *The ALJ's evaluation of Plaintiff's migraine headaches is supported by substantial evidence.*

The ALJ complied with the applicable legal framework when evaluating evidence of Plaintiff's migraine headaches. For example, the ALJ followed the steps required by SSR 16-3p. The ALJ first determined that Plaintiff has medically determinable impairments (history of migraine headaches, mild lumbar degenerative disc disease, obesity, depression, anxiety disorder, and PTSD) that could reasonably cause the type of symptomatology alleged. (Doc. 10-18, PageID 1508-09, 1518.) Next, the ALJ considered the evidence in the record and concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence of record. (*Id.* at PageID 1518.)

Plaintiff challenges the ALJ's analysis at the second step required by SSR 16-3p. However, the Court finds the ALJ adequately considered the objective medical and other evidence when evaluating the intensity and persistence of Plaintiff's symptoms, including Plaintiff's reported headaches, and substantial evidence supports his conclusion.

For example, the ALJ provided a summary of Plaintiff's medical records and treatment history for migraine headaches. (Doc. 10-18, PageID 1508-09, 1516, 1518.) The ALJ acknowledged many of Plaintiff's subjective complaints, which included

complaints of headaches associated with some numbness, weakness, nausea, and/or photophobia. (Doc. 10-18, PageID 1508-09.) The ALJ also acknowledged that Plaintiff reported headache frequency ranging from once every few months to once per week at times. (*Id*.) The ALJ cited many abnormal objective findings in the record, including a July 2011 MRI of the head that showed some evidence of migraine activity and a May 2015 MRI that confirmed a congenital Chiari I malformation. (*Id.* at PageID 1508.) The ALJ compared these subjective complaints and abnormal objective findings to normal objective findings, such as normal intracranial MRA in May 2015 and relatively normal neurological examinations. (*Id.* at PageID 1509, 1518.) The ALJ also cited to some of Plaintiff's statements to her providers that medication and rest were effective in helping alleviate her headache symptoms. (*Id.* at PageID 1508.)

The ALJ concluded that the balance of the evidence did not support Plaintiff's allegations of symptom severity. The ALJ followed SSR 19-4p and accounted for the evidence regarding Plaintiff's headaches in the RFC by limiting her to work that involves no hazards (such as unprotected heights or dangerous machinery), no driving of automotive equipment, no concentrated exposure to loud noise, and indoor work (to preclude exposure to bright sunlight). (Doc. 10-18, PageID 1515-16.) Accordingly, the ALJ's evaluation of Plaintiff's symptom severity is consistent with applicable legal requirements, and his conclusions are supported by substantial evidence.

Plaintiff contends:

ALJ Kenyon purports to diminish the severity and limiting effects of Plaintiff's migraine headaches secondary to the same not having been linked to her Chiari malformation and also secondary to a normal

18

> intercranial MRA. See (Tr. 1508-09). In doing so, ALJ Kenyon plainly
> assumes the role of medical expert himself, a role he was neither qualified
> nor permitted to fill.

(Doc. 11, PageID 1818.) This argument fails for two reasons.

First, the ALJ did not improperly act as a medical expert. (*See* Doc. 11, PageID 1818.) The regulations require ALJs to evaluate the medical evidence to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.945(a)(3); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence"); *Coldiron v. Comm'r of Soc. Sec.,* 391 F. App'x. 435, 439 (6th Cir. 2010) ("[T]he ALJ—not a physician—ultimately determines a claimant's RFC . . . . An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."). That is precisely what the ALJ did here.

Second, Plaintiff's argument fails because the ALJ did not "diminish the severity and limiting effects of Plaintiff's migraine headaches because the complaints were not attributed to Chiari malformation and because of a normal intercranial MRA." (*See* Doc. 11, PageID 1818.) Plaintiff cites to the ALJ's discussion of Plaintiff's headaches at Step Two in support of this assertion, but Plaintiff's argument mischaracterizes the ALJ's Step Two discussion. The ALJ did not specifically conclude that Plaintiff's symptoms were not as severe as alleged because no link to the Chiari malformation was found and because an intracranial MRA was normal. Instead, as discussed above, the ALJ merely summarized the records that documented Plaintiff's treatment for her headache

19

complaints: He discussed Plaintiff's subjective complaints, treatment with a neurologist, the objective findings that were documented on imaging reports, and Plaintiff's response to treatment. (Doc. 10-18, PageID 1508-09.) The ALJ also acknowledged in the RFC analysis that the existence of Plaintiff's headaches was not disputed, because the July 2011 MRI scan showed evidence of possible migraine activity. (Doc. 10-18, PageID 1516.) Therefore, the ALJ did not discount Plaintiff's migraine pain "secondary to a purported failure of medical imaging to correspond with those headaches" as Plaintiff alleges. (Doc. 11, PageID 1818.)

Plaintiff also argues that the ALJ erred by focusing too heavily on the 2015 evidence and insufficiently considering the evidence dated earlier in the closed period:

> [T]he fact that Plaintiff's headaches were more frequent or severe prior to 2015 and decreased in frequency and severity in 2015 is consistent with Plaintiff's allegations of disability for the closed period of disability under consideration. By drawing the inverse conclusion, ALJ Kenyon appears to join his predecessor in unduly focusing upon the most recent records as determinative to Plaintiff's allegations for the entire period at issue despite the fact that earlier records from that period fail to support his premise.

(Doc. 11, PageID 1819-20.) This argument fails because the ALJ evaluated the headache evidence for the entire requested closed period.

The ALJ acknowledged that Plaintiff "had several emergency room visits during the closed period for headache pain and unexplained left-sided paralysis (Exhibits B9F / B12F / B39F)." (Doc. 10-18, PageID 1508.) The exhibits that the ALJ cited correspond with emergency department visits that occurred early in the closed period—in November 2010 (Exhibit B9F at Doc. 10-7, PageID 374-88), May 2011 (Exhibit B12F at Doc. 10-7,

PageID 423-29), and October 2013 (Exhibit B39F at Doc. 10-16 PageID 1131-40). Significantly, these intermittent emergency room visits are the only such visits for headaches that are documented during the requested closed period.

The ALJ also acknowledged that Plaintiff continued to complain of headaches and was evaluated by a neurologist: "On continued complaints of headaches and numbness (Exhibits B15F/B37F at 1, 14), [Plaintiff] was referred for neurological evaluation in May 2011 (Exhibits B13F/B16F)." (Doc. 10-18, PageID 1508.) Here, the ALJ cited to primary care records that are dated between 2010 and 2011—although Plaintiff did not begin complaining of headaches to Dr. Barnes Lark until May 2011. (Doc. 10-7, PageID 456-52, *see* PageID 443.) As the ALJ pointed out, Plaintiff underwent a neurological evaluation in May 2011 (Doc. 10-18, PageID 1508, citing Doc. 10-7, PageID 466.) Significantly, neurologist Sophia Cheng, M.D. started Plaintiff on Topamax at that time. (Doc. 10-7, PageID 467.) As the ALJ also recognized, the record contained no evidence that Plaintiff followed up with Dr. Cheng. (Doc. 10-18, PageID 1508.) Indeed, subsequent records from Dr. Barnes Lark, as well as subsequent emergency room notes, showed that Plaintiff complained of several other issues but had no further headache complaints until April 2013. (*See, e.g.*, Doc. 10-8, PageID 590, 594, 637, 662.)

Records dated since that time and prior to the end of the requested closed period also support the ALJ's conclusions. For example, the April 2013 primary care records referenced headache complaints but contained no notations of severity or frequency. (Doc. 10-16, PageID 1103-1106.) Plaintiff apparently made no mention of headaches at the next primary care visit in May 2013. (Doc. 10-16, PageID 1099.) A few months later

in October 2013, Plaintiff returned to the emergency room with complaints of headaches, but reported that her symptoms started only three days earlier—and said that she had migraines only "in the past." (Doc. 10-16, PageID 1131.) When Plaintiff followed up with Dr. Barnes Lark in November 2013, Plaintiff said she had not been taking Topamax because she was unable to book an appointment with the neurologist. (Doc. 10-16, PageID 1095.)

Although Plaintiff was apparently unable to see a neurologist at that time, subsequent records showed no further complaints of headaches for well over a year. (*See, e.g.,* Doc. 10-16, PageID 1091-93, 1165, 1087-89.) Plaintiff eventually complained of headaches during a primary care visit in March 2015 (Doc. 10-16, PageID 1082), and upon referral from Dr. Barnes-Lark, Plaintiff saw neurologist Shumel Man, M.D. in May 2015. (Doc. 10-17, PageID 1372.) As the ALJ noted, Plaintiff told the neurologist that she "rarely" had headaches. (Doc. 10-18, PageID 1508, citing Doc. 10-17, PageID 1372.) Although Plaintiff complained of increased headache frequency in June 2015, Dr. Man adjusted her medications. (Doc. 10-17, PageID 1386.) This adjustment was apparently effective, because Plaintiff and her attorney acknowledged at the hearing and in the Statement of Errors that her headaches improved after Plaintiff started an increased dose of Neurontin. (Doc. 10-18, PageID 1536; Doc. 11, PageID 1819-20.)

Accordingly, the Court finds that the ALJ adequately considered the objective medical and other evidence—for the entire requested closed period—when evaluating the intensity and persistence of Plaintiff's symptoms, including Plaintiff's reported headaches. Further, substantial evidence supports the ALJ's conclusions.

Finally, Plaintiff challenges the limitations that the ALJ included in the RFC to address Plaintiff's headaches. Plaintiff argues that the ALJ "mischaracterized or at least over generalized Plaintiff's testimony toward the ends of diluting her migraine related limitations." (Doc. 11, PageID 1820.) This argument also fails.

Plaintiff has the burden of proving that she is disabled and showing how her impairment affects her functioning. *See* 20 C.F.R. § 404.1512(a); *see also Foster v. Bowen,* 853 F.2d 483, 489 (6th Cir. 1988). Further, it is well-established that an ALJ may reasonably discount a claimant's subjective complaints on the grounds that the objective medical evidence does not support those complaints. 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in "making reasonable conclusions about the intensity and persistence" of a claimant's symptoms); *Long v. Comm'r of Soc. Sec.*, 56 F. App'x 213, 214 (6th Cir. 2003) (holding that plaintiff "did not introduce sufficient objective evidence to support the existence or severity of her allegedly disabling headaches"); *Daniel H. v. Comm'r of Soc. Sec.,* No. 3:20-cv-393, 2022 WL 883771, at *6 (S.D. Ohio March 25, 2022) (Silvain, M.J.); *Jeter v. Comm'r of Soc. Sec.,* No. 3:19-cv-137, 2020 WL 5587115, at *3 (S.D. Ohio September 18, 2020) (Ovington, M.J.); *Jamaal D. v. Comm'r of Soc. Sec.,* No. 3:20-CV-315, 2022 WL 794679, at *6 (S.D. Ohio Mar. 16, 2022) (Silvain, M.J.); *Teasley v. Comm'r of Soc. Sec.,* No. 2:18-cv-1079, 2019 WL 2559514, at *14 (S.D. Ohio June 21, 2019) (Vascura, M.J.).

Because the ALJ applied the proper legal standards and reached a decision supported by substantial evidence, the ALJ did not err in his evaluation of Plaintiff's migraine headaches.

### B.    Consultative Psychologist Giovanni Bonds, Ph.D.

### 1.    *Applicable law*

Because Plaintiff's claim was filed before March 27, 2017, the opinion evidence

rules set forth in 20 C.F.R. § 404.1527 apply. These regulations require ALJs to adhere to

certain standards when weighing medical opinions. First, the ALJ is required to consider

and evaluate every medical opinion in the record. *See* 20 C.F.R. § 404.1527(b), (c).

Further, "greater deference is generally given to the opinions of treating physicians than

to those of non-treating physicians, commonly known as the treating physician rule."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted).

The regulations define a "treating source" as a claimant's "own acceptable medical

source who provides . . . medical treatment or evaluation and who has . . . an ongoing

treatment relationship" with a claimant. 20 C.F.R. § 404.1527(a)(1). The "treating

physician" rule is straightforward: "Treating-source opinions must be given 'controlling

weight' if two conditions are met: (1) the opinion 'is well-supported by medically

acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not

inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v.*

*Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R.

§ 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

The treating physician rule does not require ALJs to ignore inconsistencies

between a treating source's opinion and the evidence in the record. Instead, an ALJ can

"properly discount even a treating source opinion if the opinion is unsupported and

24

inconsistent with other substantial evidence in the record." *Herndon v. Comm'r of Soc. Sec.*, Case No. 20-6094, 2021 U.S. App. LEXIS 15178, *15 (6th Cir. May 20, 2021).

If the treating physician's opinion is not controlling, then "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th Cir. 2004)).

"Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2); other citation omitted)); *see Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Hargett*, 964 F.3d at 552 (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996))[6]. The goal is to make clear to any subsequent reviewer the weight given and the reasons for giving that weight. (*Id.*) Substantial evidence must support the reasons provided by the ALJ. (*Id.*) The good reasons requirement cannot be satisfied with general and non-specific assertions of

---

[6] SSR 96-2p has been rescinded. However, this rescission is effective only for claims filed on or after March 27, 2017. See SSR 96-2p, 2017 WL 3928298 at *1. Because Plaintiff filed his application for benefits prior to March 27, 2017, SSR 96-2p still applies in this case.

inconsistency with other evidence in the record. *Smalley v. Comm'r of Soc. Sec.*, __ Fed. Appx. __, Case No. 20-1865, 2021 U.S. App. LEXIS 26754, *14 (6th Cir. Sept. 3, 2021).

As for medical opinions from sources that are not "treating sources" as defined in 20 C.F.R. § 416.967(a)(1), the ALJ must consider the following factors set forth for the evaluation of medical opinions: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. § 404.1527(c).

The ALJ must also consider opinions from medical sources who are not "acceptable medical sources" and from nonmedical sources using the same factors listed in § 416.927(c), although "not every factor for weighing opinion evidence will apply in every case." 20 C.F.R. § 416.927(f)(1).  Additionally, the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2).

### 2. *Although the ALJ partially erred in his evaluation of Dr. Bonds' opinion, the error is harmless*

The ALJ assigned "only partially [sic] weight" to Dr. Bonds' opinion. (Doc. 10-18, PageID 1511.) The ALJ recognized that Dr. Bonds performed a one-time examination of Plaintiff on behalf of the Division of Disability Determination. (*Id.* at PageID 1510.) The ALJ properly evaluated the factors of examining relationship, treating relationship, and frequency of examination. 20 C.F.R. § 404.1527(c)(1), (2).

The ALJ erred, however, by finding that "[Plaintiff's] propensity to walk off jobs seems fully within her control and not the result of uncontrolled anxiety or depressive symptoms." (Doc. 10-18, PageID 1511.) This finding appears to be based on speculation rather than on any evidence in the record. Although Dr. Bonds documented Plaintiff's statements that she sometimes left her job early due to stress (Doc. 10-7, PageID 446, 448, 452-53), neither Plaintiff nor Dr. Bond suggested that Plaintiff left early because she freely chose to do so, rather than because of mental health symptoms. And Dr. Bonds opined only that Plaintiff "may perform best in a low stress job where there are fewer demands." (*Id.* at PageID 453.)

Nevertheless, the Court finds that the error is harmless because the ALJ's findings are consistent with Dr. Bonds' opinion. The ALJ found that Plaintiff had the severe impairments of depression, anxiety disorder, and PTSD. (Doc. 10-18, PageID 1508.) The ALJ imposed the limitations of "performing simple, repetitive tasks with an SVP 1 or 2" with only occasional social contacts. (*Id.* at PageID 1515.) The ALJ also reduced Plaintiff's exposure to stressful workplace situations by limiting her to jobs with "no fast-paced work or strict quotas" and that "involve very little, if any, change in the job duties or the work routine from one day to the next." (*Id.*) Moreover, the vocational expert testified that these limitations would preclude work as a licensed practical nurse, which was the same job that Plaintiff reported to Dr. Bonds was stressful and caused her to leave early. (Doc. 10-18, PageID 1553.) Thus, although this particular finding regarding Dr. Bonds' opinion is not supported by substantial evidence, the error is harmless.

## VI.    CONCLUSION

In sum, except for one harmless error with regard to Dr. Bonds' opinion, the Court finds that the ALJ complied with the applicable legal framework and his conclusions are supported by substantial evidence. The ALJ's decision must therefore be affirmed.

**IT IS THEREFORE ORDERED THAT**:

1.    Plaintiff's Statement of Errors (Doc. 11) is OVERRULED;

2.    The Court AFFIRMS the Commissioner's non-disability determination; and

3.    The case is terminated on the Court's docket.

*/s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

28